FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   RUDOLPH MAXIMILIAN        Chapter 7
             GOEPP, III,

                    Debtor.        Case No.  10-29384 (RTL)

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

DAVID E. COLLIER,

                    Plaintiff,

           v.                      Adversary Proceeding

                                   Case No. 10-2314 (RTL)

RUDOLPH MAXIMILIAN GOEPP, III,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

**APPEARANCES**:

Ronald M. Katkocin, Esq.
Attorney for Plaintiff

TEICH GROH
Barry W. Frost, Esq.
Attorney for Defendant

**RAYMOND T. LYONS, U.S.B.J.**

## OPINION

**I.    INTRODUCTION**

Plaintiff, David Collier, seeks a determination of non-dischargeability of debts arising

from a series of loans made by him to Debtor, Rudolph Maximilian Goepp, over the course of

1

roughly four years. During most of that time Debtor served as Plaintiff's attorney-in-fact under a power of attorney. The court finds that Debtor never intended to repay these loans, making them non-dischargeable under the fraud exception of 11 U.S.C. § 523(a)(2)(A). Furthermore, the court finds that the power of attorney in favor of Debtor created a fiduciary relationship for the purposes of 11 U.S.C. § 523(a)(4), and that Debtor's borrowing money from Plaintiff amounted to defalcation, thus establishing a second, independent basis for non-dischargeability. Accordingly, judgment is entered for Plaintiff and the debts are found to be non-dischargeable.

**II.    JURISDICTION**

The court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code, or arising in or related to a case under Title 11, to the bankruptcy court.

As the requested relief is non-dischargeability of particular debts, this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

**III.    FACTS AND PROCEDURAL HISTORY**

Plaintiff and the Debtor were close friends for many years. They met late in the 1960's. Plaintiff's wife and Debtor's mother became acquainted through their work and the families regularly socialized in their homes.

Plaintiff is an elderly gentleman, age 82, who has resided in a nursing home since 2006. He has suffered two broken hips and has difficulty walking. He retired from a career as a college professor and spends much of his time reading. His wife died in 2007. Plaintiff's appearance was very good – he was well dressed and groomed and presented a dignified, serene attitude. He speaks like the well-educated man that he is. Some of his mannerisms and speech reflect those

of a gentleman of a previous era.  Also, he had sufficient stamina to remain attentive through a full day of court hearings.

On direct examination, Plaintiff was responsive, though at times deliberate.  His recall of events and dates was accurate and can be attributed to appropriate pretrial preparation.  On cross examination, the picture was remarkably different.  Plaintiff was easily confused about the sequence of events and obviously mistaken about dates.  For example, he persisted in his statement regarding the date on which he first met Debtor's mother and step-father even though it was pointed out that they had died before then.  Also, Plaintiff's recollection of his assets at the time he gave Debtor a power of attorney was clearly inaccurate.  He mentioned only a few thousand dollars when, in fact, he owned liquid assets worth several hundred thousand dollars.  As described in more detail below, Debtor testified about two occasions where they met at Plaintiff's bank in Princeton and certified checks were issued to Debtor.  Plaintiff had no recollection of these significant events. The court concludes that Plaintiff has diminished mental capacity.

The Debtor is not a young man either; he is 69 years old.  He obtained an undergraduate degree from Harvard College in 1963.  After one year of law school he quit and then embarked on a Ph.D. program in economics.  After completing all course work in that program he attempted three dissertations but was not awarded a degree in economics.  He switched universities again and completed a Ph.D. in psychology in 1985.  During his long educational pursuit the Debtor supported himself with grants, stipends and part time jobs, as well as some family money.

The Debtor lived with, and was romantically involved with, a woman who was a principal in a real estate business.  The Debtor worked as a trainer for the sales staff.  His

employment ended when the woman left that company to start her own firm. He moved out of her house and moved in with a friend for a year and a half until the Summer of 1993. He returned to live in his mother's Princeton, New Jersey house in 1993. Upon returning to Princeton, Debtor began to care for his elderly and ailing mother, as well as for Carla, his older, unmarried sister, who also returned to the Princeton home in 1993, upon developing Alzheimer's disease. During this period, he received some financial assistance from Carla, but it appears that his primary source of funds was a home-equity line of credit on the Princeton house, opened by his mother to pay household expenses.

In 1994, upon his mother's death, Debtor became executor of her estate and apparently had unfettered access to the home-equity line of credit. The beneficiaries of the mother's estate included Debtor, Carla, and their younger sister Hildegarde. Later, in 1999, Debtor began using a power of attorney given to him by Carla to withdraw money from her IRA; ultimately, he would withdraw substantially all of Carla's IRA funds, in excess of $500,000. Apparently, Debtor issued promissory notes to his sister in exchange for her IRA funds and then, as executor of his mother's estate, he mortgaged the Princeton house in his favor, in exchange for using the borrowed IRA funds to pay household expenses. He similarly borrowed money from Carla's IRA to buy out Hildegarde's interest in the Princeton home; this transaction was also structured so that Debtor assumed liability on promissory notes in exchange for the funds and then obtained a mortgage on the Princeton home in exchange for providing funds to his mother's estate. Also just prior to Carla's death, Debtor used his power of attorney to transfer her interest[1] in the Princeton house to himself.

---

[1] In his deposition testimony, Debtor states that, just prior to her death, Carla held a 100% interest in the house. It is unclear how she acquired a full interest, as Debtor testified earlier in his deposition that the house was left in equal parts to himself and his two sisters. Perhaps title

4

In 2003, upon Carla's death, Debtor became executor of her estate, which consisted of an IRA that was almost entirely depleted and replaced with promissory notes from Debtor. Debtor and Hildegarde were beneficiaries of Carla's estate. Debtor made no repayments on the promissory notes he had given for the money borrowed from Carla's IRA.

Late in 2005, Debtor had depleted all of the funds he inherited from his family, and was left with nothing more than the Princeton house. He had no employment since returning to Princeton in 1993. Accordingly, he turned to a sale of the house as his only option for continued financial support. Debtor obtained a contract to sell the Princeton house for $713,500, substantially more than the mortgages; however, the buyer's title company raised Hildegarde's interest as beneficiary of the mother's estate as an exception to title. Debtor produced the release that Hildegarde had signed, but the title company would not insure over her possible interest in the mother's home. Since Debtor could not convey clear title, the buyer cancelled the contract. Hildegarde disputed the validity of the release by which Debtor claimed she had relinquished her interest in the house. Litigation ensued in the New Jersey state court over Debtor's actions as executor of their mother's estate and his use of his sister's assets.

While the litigation was pending, Debtor needed funds both to pay his attorneys and for continued financial support. In May of 2006, the Debtor told Plaintiff that he could use some money to cover his expenses, such as real estate taxes, until the sale of his mother's home could be completed. Plaintiff met Debtor for lunch; together they went to Plaintiff's bank and withdrew $5,500 payable to Debtor. Debtor gave Plaintiff a Promissory Demand Note payable

---

had to be in Carla's name to refinance the home equity line of credit in 2000. Regardless, for the purposes of this opinion, the only relevant fact is that Debtor used his power of attorney to transfer title from Carla to himself.

5

with interest at 12% that he signed before a notary at the bank. A month later in June 2006, a second $5,500 was withdrawn from Plaintiff's bank payable to Debtor and a promissory note given in return.

At about this same time, Plaintiff's wife was diagnosed with cancer and moved to an apartment where she had easier ingress and egress than their martial residence. In the Summer of 2006, Plaintiff broke one hip, was hospitalized, went to rehab, then broke his other hip. He ended up in a nursing home where he has lived since September 2006. Plaintiff's wife took over the family finances.

While Plaintiff's wife was alive, Debtor borrowed money from her and gave her promissory notes totaling $100,000. He never repaid anything to Plaintiff's wife. Throughout this time, Debtor maintained his close friendship with Plaintiff and visited him frequently at the nursing home. On September 7, 2007, Debtor was given power of attorney for Plaintiff. Shortly thereafter, on September 21, 2007, Plaintiff's wife died. Debtor arranged to transfer Plaintiff's bank accounts to a new bank and took charge of Plaintiff's checkbook and mail. Although Debtor had physical possession of Plaintiff's checkbook, he rarely wrote a check on Plaintiff's account.[2] When Debtor visited Plaintiff, he would bring the checkbook and bills and Plaintiff would write and sign all checks.

In late 2007, Debtor and Plaintiff discussed Debtor's need for money to pay real estate taxes. Plaintiff wrote and signed a check for $6,949.73 to Debtor dated December 26, 2007. The Debtor, also, told Plaintiff that he needed money to pay the costs of the suit with his sister. Once each month in January, February, March, April and May of 2008, Plaintiff wrote a check to

---

[2] Debtor's testimony is that he only ever signed five checks on behalf of Plaintiff under the power of attorney. Four of these were for Plaintiff's state and federal tax bills, and the fifth was a monthly payment to Plaintiff's nursing home.

6

Debtor for $7,300. On each of the first four checks, Plaintiff wrote in the memo space "lawsuit". In a pleading filed in state court, Debtor asserted that the value of the house had declined below the amounts due on the mortgages leaving no equity. That litigation was settled and a written mediation settlement agreement, dated February 22, 2008, was filed with the court. The Debtor later tried unsuccessfully to set aside the agreement. It was clear after the mediation agreement that Debtor would receive nothing further from his family's assets. In early 2008 the first mortgagee started a foreclosure action on the mother's house in state court. The Debtor first consulted a bankruptcy lawyer as early as March or April, 2008.

No more loans were given during 2008 except for one check in December 2008 for $3,000. Then in March 2009, the Debtor began borrowing $7,000 per month. Each check had as a memo "Loan". This continued for fifteen months until June of 2010 when Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on June 24, 2010. Debtor kept a spreadsheet showing all of his borrowings from Plaintiff and his wife. Apparently with each check Debtor had prepared, signed and delivered a promissory note payable on demand with 12% interest. By his calculations the principal and interest totaled $325,000. He listed Plaintiff as an unsecured creditor in that amount.

On July 12, 2010, the Debtor had arranged for his lawyer to visit Plaintiff. When the lawyer learned of the borrowing by Debtor he hand wrote a revocation of power of attorney for Plaintiff's signature and delivered it to Debtor when he arrived at the nursing home later that day. Debtor was told never to visit Plaintiff again

At the time of these loans, Debtor's sole income was a meager social security benefit. He had no other income and no assets. He also had no prospects for employment and he had depleted all of his deceased mother's and sister's assets. He had no means to repay the loan.

The Debtor claims he intended to repay the loan from the equity in his mother's house, and this is what he told Plaintiff at the time of the loans.

According to him there was substantial equity in his mother's house at the time he contracted to sell it. Because that sale was frustrated by his younger sister's claim of an interest in the house, he was unable to sell at the peak of the market and the house has since decreased in value below the liens on it. He also says he has a claim against a title insurance company relating to his sister's interest in the house that he still hopes will yield some cash. The chapter 7 trustee in his bankruptcy case has retained his attorney to prosecute that title insurance claim.

Yet the Debtor's own words and actions belie his testimony. He wrote in a letter brief sent to the state court during the litigation with his sister that, as of as early as February 22, 2008, there was no value in his mother's home over and above the liens on it. Notably, the bulk of the checks at issue were written after this date. Only three of the checks (totaling approximately $21,500) bear an earlier date. Furthermore, Debtor testified at deposition that he first consulted his bankruptcy attorney as early as March or April of 2008. His mother's house was already in foreclosure by that time. On his bankruptcy schedules the Debtor valued the house at $600,000 and listed mortgages totaling $746,637. While there may have been some value above the mortgage in 2006 when the contract of sale was signed, when the Debtor borrowed from Plaintiff in 2008, 2009 and 2010 that equity had eroded due to the decreasing market and accumulating interest and taxes.

Debtor deserves a great deal of credit for serving as the caregiver for his mother and then for his older sister afflicted with Alzheimer's disease. That was surely physically and emotionally demanding. Also, it is understandable that the family's financial resources would be devoted to paying the living and medical expenses for three people. However, the manner in

8

Case 10-02314-RTL    Doc 14    Filed 08/16/11    Entered 08/16/11 11:48:06    Desc Main
                    Document      Page 9 of 17

which the Debtor gave promissory notes to his sister's IRA then lent money to the mother's estate, granting himself a mortgage in return, suggests something ranging from rationalization of his ending up with sole ownership of the mother's house (or so he thought) to a nefarious plot to deprive his younger sister of her share, to something bordering on delusional.  In addition, the Debtor was unable to give a comprehensible explanation of his claim against the title company.

In the same vein, Debtor deserves credit for his frequent, kind visits to Plaintiff in the nursing home and his companionship for several years.  Nevertheless, the court concludes that Debtor had no intention of repaying Plaintiff for any of the money lent to him.

## IV. DISCUSSION

The Bankruptcy Code's primary purpose is to provide relief to debtors, in the form of a fresh start. *Araps v. DeBaggis (In re DeBaggis)*, 247 B.R. 383, 388-389 (Bankr. D.N.J. 1999). However, this policy of debtor relief is not without limits; the Code expressly creates exceptions to discharge for certain types of debts.  *See* 11 U.S.C. § 523(a).  Here, two of these exceptions are at issue: the fraud/false representation exception under § 523(a)(2)(A) and the fraud/defalcation while acting in a fiduciary capacity exception under § 523(a)(4).  They are discussed below.  The plaintiff bears the burden of proving that these exceptions apply.  *See* FED. R. BANKR. P. 4005.  However, the standard of proof is a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. at 287-88 (1991).

### a. Money Obtained by False Representation, § 523(a)(2)(A)

Under § 523(a)(2)(A) of the Bankruptcy Code, a discharge is not available for debts:

> for money . . . or an extension . . . of credit, to the extent
> obtained by false pretenses, a false representation, or actual
> fraud, other than a statement respecting the debtor's . . .
> financial condition.

Generally, exceptions to discharge are narrowly construed. *DeBaggis*, 247 B.R. at 388. However, there is a countervailing policy that debts incurred through fraud should not be discharged. *Id*. "Where a debtor has committed fraud under the code, he is not entitled to the benefit of a policy of liberal construction against creditors." *Cohen v. De La Cruz (In re Cohen)*, 106 F.3d 52, 59 (3d Cir. 1997), aff'd 523 U.S. 213 (1998). This countervailing policy is codified in § 523(a)(2)(A) of the Bankruptcy Code.

This fraud exception to discharge has "the same meaning in the Bankruptcy Code as in the common law of torts." *DeBaggis*, 247 B.R. at 388-89. Under the common law definition of fraud, a creditor must prove the following elements to demonstrate non-dischargeability:

(1) the debtor represented a fact, opinion, intention or law;

(2) the representation was false;

(3) the representation was material;

(4) the debtor obtained money, property or services through the misrepresentation;

(5) the debtor knew at the time that the statement was false (or was made with reckless disregard for its truth);

(6) the debtor intended the creditor to rely on the statement;

(7) the creditor actually relied on the statement;

(8) the reliance was justified;

(9) the creditor sustained damage; and

(10) the damages were the proximate result of the false representation.

*Id*. at 389.

Here, it is clear that, in delivering the promissory notes, Debtor expressly and impliedly represented an intention to repay when he obtained the loans from Plaintiff, thereby satisfying element (1). Furthermore, it is beyond reasonable dispute that this promise to repay was material, that Debtor obtained the loans as a result of this promise, that Debtor intended for Plaintiff to rely on the promise in making the loan, that Plaintiff justifiably did so rely on the promise, and that Plaintiff suffered a loss as a result of the promise. Thus, the court need not discuss elements (3), (4), (6), (7), (8), (9), or (10). That leaves elements (2), (5).

### i. Elements (2) and (5) – Intent to Repay

As to elements (2) and (5), that the promise to repay was false and that Debtor knew that it was false, these representation can essentially be merged into a single inquiry: did Debtor intend to repay the loans when he obtained them through his promise to do so? *See In re Ritter*, 404 B.R. 811, 825 (Bankr. E.D. Pa. 2009) (conducting a similar inquiry in the context of credit card charges).

Because of the difficulty inherent in proving a debtor's state of mind at the time he incurred a debt, courts have found the use of circumstantial evidence to be sufficient; thus these two elements may be established by the totality of the circumstances. *Id*. at 825-26. These circumstances can include such factors as:

(1) The length of time between incurring the debt and filing bankruptcy;

(2) Whether an attorney was consulted concerning the filing of bankruptcy before the debt was incurred;

(3) The number of debts incurred;

(4) The amount of the debts;

(5) The debtor's financial condition at the time the debts were incurred;

Document    Page 12 of 17

    (6) Whether the debtor was employed;

    (7) The debtor's prospects for employment;

    (8) The debtor's financial sophistication;

*See id.* at 826 (outlining factors in credit card context).

    Here, many of these factors suggest that Debtor never intended to repay Plaintiff. First, Debtor borrowed money from Plaintiff on at least 20 separate occasions, excluding the loans made by Plaintiff's wife. Pointedly, most of these loans were made after Debtor first consulted his bankruptcy attorney. Further, the total amount of these debts is quite substantial, especially given Debtor's financial condition and prospects – as noted above, Debtor's only income was a small social security payment, and his only asset, his mother's house, was the subject of ongoing litigation and already over-encumbered. The contract of sale made at the peak of the market had fallen through and the market had already declined. The mediated settlement in February 2008 made clear that Debtor would not receive anything from the house. Yet further, Debtor's employment history and advanced age suggest little reasonable hope of a dramatic change in his financial circumstances. Finally, given Debtor's education and access to legal advice, the court finds him to be sufficiently sophisticated to have understood that he had little hope of ever repaying these loans. Indeed, in light of Debtor's failure to repay substantial sums he had previously borrowed from his sister and from Plaintiff's wife, via promissory notes such as the ones he gave Plaintiff, the court concludes that Debtor never intended to be bound by these promissory notes. Moreover, given that he appears to have escaped repaying his sister when she died and left him as executor of her estate, it seems likely that Debtor was simply hoping that his debts to a man of Plaintiff's age would never be called due.

Thus, the totality of the circumstances – specifically, Debtor's pattern of borrowing, on an unsecured basis, substantial funds from elderly members of his family and social circle, all while having no real prospect of repayment – lead this court to find that Debtor did not intend to repay Plaintiff; that is, his promise to repay was false and he knew it was false. Accordingly, the elements of § 523(a)(2)(A) are met.

### b. Defalcation While Acting in a Fiduciary Capacity, § 523(a)(4)

Under § 523(a)(4) of the Bankruptcy Code, a discharge is also not available for debts "for fraud or defalcation while acting in a fiduciary capacity . . . ." This discharge exception thus raises two questions; first, did a fiduciary relationship exist, and second, was there a defalcation.

#### i. Fiduciary Relationship

While a fiduciary relationship is typically created by state law, not all state law fiduciary relationships are covered by § 523(a)(4). *See Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 166-167 (2d Cir. 1999) ("For example, state law can be an important factor in determining whether someone acted in a fiduciary capacity under Section 523(a)(4). On the other hand, there are federal limits on the ability of state law to expand the effects of this provision.") (citations omitted).

A power of attorney can create a fiduciary relationship for the purposes of § 523(a)(4). *See, e.g., Eveland v. Kishbaugh (In re Kishbaugh)*, 399 B.R. 419, 426 (Bankr. M.D. Pa. 2009); *Kramer v. Kramer (In re Kramer)*, 317 B.R. 297, 300 (Bankr. W.D. Pa. 2004); *see also Silver Care Ctr. v. Parks (In re Parks)*, Adv. No. No. 05-2774, 2007 Bankr. LEXIS 2372, at *46-*48 (Bankr. D.N.J. July 10, 2007) (while a power of attorney does not create a fiduciary relationship with creditors who relied on it, it does create a fiduciary relationship between the principal and agent). While some courts have held that a factual inquiry is required to determine whether a

power-of-attorney creates a § 534(a)(4)-type fiduciary relationship, these courts generally look to whether there was a power imbalance or whether the principal had an ability to monitor the attorney-in-fact. *See Estate of Smith v. Marcet (In re Marcet)*, 352 B.R. 462, 473 (Bankr. N.D. Ill. 2006) (power of attorney creates a § 523(a)(4)-type fiduciary relationship where there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter") (internal quotation omitted, ellipses in original); *May v. Lyon (In re Lyon)*, 348 B.R. 9, 23-24 & n.33 (Bankr. D. Conn. 2006) (citing cases applying a fact-specific approach to powers-of-attorney and noting that a § 523(a)(4) fiduciary relationship "may be found when one party to a . . . fiduciary relationship is incapable of monitoring the other's behavior") (internal quotation omitted).

Here the facts of Debtor's relationship with Plaintiff demonstrate a clear power imbalance. As noted above, Plaintiff was very much dependent on Debtor. Furthermore, he had little ability to monitor Debtor's exercise of his power of attorney, due to his declining mental abilities, residency in a nursing home, and because of his lack of access to the internet or financial information. Indeed, Plaintiff did not have possession of his own checkbook, which, as noted above, was maintained by Debtor. This inability to access his own money without Debtor's help is clearly sufficient to create a power imbalance. The court finds that Debtor's power of attorney created fiduciary obligations towards Plaintiff, of the type contemplated by § 523(a)(4).

    **ii.**    **Defalcation**

The Bankruptcy Code does not define the term "defalcation," though it is well accepted that this term means something less than fraud or embezzlement. *Mehta v. Stein (In re Hilton L. Stein, LLC)*, Adv. No. 02-4013, 2011 Bankr. LEXIS 1327, at *14 n.1 (Bankr. D.N.J. Apr. 4,

2011) (quoting Judge Learned Hand in *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 512 (2d. Cir. 1937)). Beyond this general idea, "no judicial consensus has emerged as to the meaning of the term 'defalcation' in this context." *Bannon v. Tyson (In re Tyson)*, Adv. No. 09-0093, 2011 Bankr. LEXIS 1610, at *23 (Bankr. E.D. Pa. May 4, 2011).

The leading treatise identifies defalcation as a failure to fully account for funds handled in a fiduciary capacity. 2 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER BANKRUPTCY MANUAL ¶ 523.07[1][b] (4th ed. 2011); *see also Storie v. Storie*, 216 B.R. 283, 287 (B.A.P. 10th Cir. 1997) (collecting cases, including *State v. Kaczynski (In re Kaczynski)*, 188 B.R. 770, 777 (Bankr. D.N.J. 1995), using the same definition).[3]

Here, of course, Debtor's actions do not fall neatly into the standard definition of defalcation. He can clearly account for the funds at issue, in that they were loaned to himself. But, defalcation is not always limited to this standard definition; it has also been held to include a general breach of fiduciary duty. *See Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 20 (1st Cir. 2002) ("Defalcation may be presumed from breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when that interest comes or may come into conflict with the beneficiaries' interest."); *In re Moreno*, 892 F.2d 417, 421 (5th Cir. 1990) (finding defalcation where a fiduciary violated his "responsibility not to lend [his principal's] money to himself or corporations controlled by him on less than an arms-length basis" and noting that a "defalcation

---

[3] The bulk of judicial opinions on the subject deal with the requisite level of intent for such a failure to rise to a defalcation; some courts hold that non-dischargeability can arise even from an innocent mistake, while others require at least negligent conduct, while still others require reckless conduct. *In re Tyson*, 2011 Bankr. LEXIS 1610, at *23-*25. While several other circuit courts have ruled on this question, the Third Circuit has not. *Id*. at *25. Within the Third Circuit, older decisions have applied the intent-less innocent mistake standard, but more recent decisions have required a heightened level of intent. *Id*. at *25-*26. (collecting cases and citing three recent cases from bankruptcy courts within the District of New Jersey, all of which required something more than mere negligence). For the purposes of this decision, the court will assume, without deciding, that defalcation requires a level of intent beyond negligence.

15

is a willful neglect of duty"); *Storie v. Storie*, 216 B.R. 283, 288 (B.A.P. 10th Cir. 1997) ("We conclude that 'defalcation' under section 523(a)(4) is a fiduciary-debtor's failure to account for funds that have been entrusted to it due to *any* breach of a fiduciary duty.") (emphasis added); *FDIC v. Gaubert*, 149 B.R. 819, 827-29 (Bankr. E.D. Tex. 1992) (defalcation found to have occurred where the debtor "willfully violated his fiduciary duties of care and loyalty").

Thus, the question of defalcation is whether Debtor violated his fiduciary duties of care and loyalty in borrowing money he could never repay, and whether he did so at least recklessly. Here, Debtor treated his principal as his personal piggy-bank, repeatedly convincing Plaintiff to loan him money despite his clear financial insolvency, discussed above with respect to Debtor's intent to repay. Though Plaintiff signed the checks himself, he was clearly of reduced mental acuity and also very dependent on Debtor. Indeed, the very reason he had given up control of his finances was because those whom he trusted indicated concern, rightfully so, about his ability to manage them himself. Thus, Plaintiff was likely relying on Debtor's advice and counsel in this matter. Given the clear conflict of interest in this transaction, the court finds that Debtor's duty of loyalty required at least that he make full disclosure of his dire financial condition. By failing to do so, Debtor recklessly, if not intentionally, placed his own interests before those of Plaintiff's, thereby breaching his duty of loyalty.

The court recognizes that, given his state of dependency and declining faculties, Plaintiff may still have agreed to loan Debtor the money even after full disclosure. In light of this likelihood, the court is inclined to say that, under the facts of this case, there is no amount of disclosure that would have allowed Debtor to borrow money from Plaintiff without breaching his duty of care. That is, Debtor had an obligation to advise Plaintiff of the imprudence of loaning money to someone in Debtor's financial condition. Had the loan involved a third-party

borrower, Debtor's failure to do so would certainly be negligent. Here, however, given that he himself was the borrower, his culpability is more on the order of recklessness.

In the final analysis, the court returns to Judge Hand's initial, somewhat cryptic notion that defalcation is something less than fraud or embezzlement. In many of the cited cases, the "something less" is intent – these cases hold that defalcation requires something less than the specific intent typically required for fraud or embezzlement. However, the way in which defalcation is less blameworthy than embezzlement need not be limited to intent. Here, Debtor would likely have been guilty of embezzlement had he simply used his power of attorney to write checks to himself. But this is not what Debtor did; rather, he used his position of power to induce Plaintiff into writing the checks. While these actions may not be sufficient to rise to the level of embezzlement, this court is convinced that they are precisely the sort of near-embezzlement malfeasance contemplated by § 523(a)(4)'s use of the nebulous term defalcation.

## V.    **CONCLUSION**

For the foregoing reasons, the loans from Plaintiff to Debtor are non-dischargeable, and judgment shall be entered for Plaintiff.


**Dated:  August 16, 2011**                    */s/ RAYMOND T. LYONS*
                                              United States Bankruptcy Judge